UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP DIVISION

-------------------------------------------------------------X

SAYFUR RAHMAN and WORLD AUTO
SALES, LLC,

    Case No. _____

                Plaintiffs,

    Hon. Dorothy Eisenberg

                -against-

    ADVERSARY PROCEEDING
    COMPLAINT

SEUNG MIN PARK, A/K/A
JOSEPH PARK, and EUN HA PARK,

                Defendants.

-------------------------------------------------------------X

       Plaintiffs Sayfur Rahman ("Rahman") and World Auto Sales, LLC ("WASLLC")

(collectively, "Plaintiffs"), by and through their counsel, allege for their adversary

proceeding complaint against Defendants Seung Min Park, aka Joseph Park, and Eun Ha

Park as follows:

## THE PARTIES AND JURISDICTION

    1.    Plaintiff Sayfur Rahman ("Rahman") is an individual who resides in the

State of New York. During all relevant times, Mr. Rahman was a minority member of

Plaintiff World Auto Sales, LLC, holding a 16.66 equity interest therein.

    2.    Plaintiff World Auto Sales, LLC ("WASLLC") during all relevant times

was a New York limited liability company, having its principal place of business located

at 42-01 Northern Boulevard, Long Island City, New York. WASLLC owned and

operated a car dealership selling new Subaru brand cars and used cars of all brands at the

foregoing location.

    3.    Defendant Seung M. Park, a/k/a Joseph Park ("Mr. Park") during relevant

times was the majority member of WASLLC and regularly transacts business at

WASLLC's principal place of business in the State of New York. During relevant times,
Mr. Park also conducted business as Auto Solution, d/b/a Jaeil Corp., with offices located
at 150-03 Northern Boulevard, Flushing New York, that purports to be in the business of
selling new and used cars. Mr. Park was a member and officer of Auto Solution during
relevant times.

4.      Defendant Eun Ha Park ("Mrs. Park") during relevant times has been the
wife of Defendant Mr. Park and has been the recipient of fraudulently
transferred/conveyed assets properly belonging to Plaintiffs.

5.      Subject matter jurisdiction over this action exists pursuant to 28 U.S.C. §
1334 and relevant provisions of the U.S. Bankruptcy Code and Federal Rules of
Bankruptcy Procedure.

## BACKGROUND OF THIS ACTION

6.      Plaintiff WASLLC was formed on January 27, 2004 and was, during
relevant times, in the business of operating a car dealership selling multiple brands of
used cars, as well as new Subaru brand cars. WASLLC had its principal place of
business located at 42-01 Northern Boulevard, Long Island City, New York.

### Mr. Park's Obtains $125,000 From Mr. Rahman

7.      In late 2006, Defendant Park, a member of WASLLC, approached Mr.
Rahman about investing in WASLLC. Mr. Park represented that WASLLC's business
was unprofitable, that sales were lagging, and that WASLLC was losing substantial sums
during many months. Mr. Park stated that he wanted to buyout much of the member
interest of Universal Capital Corp. ("UCC"), then the majority member of WASLLC, and

2

wanted Mr. Rahman to invest in WASLLC in hopes of turning WASLLC's business
around.

8.      Mr. Park solicited a S125,000 investment from Mr. Rahman, representing
that in consideration for that investment, Mr. Rahman would receive, *inter alia,* a 16.66
percent member interest in WASLLC, a guaranteed $10,000 in monthly profit
distributions, as well as an additional one-third (1/3) share of any WASLLC profit
distributions that Mr. Park otherwise was entitled to.

9.      Reasonably relying on those representations by Mr. Park, Mr. Rahman
subsequently made a $125,000 investment in WASLLC in consideration of, *inter alia,*
the foregoing member interest in WASLLC and foregoing profit distributions. The
agreement setting forth the terms of the agreement between Mr. Park and Mr. Rahman
was prepared by counsel for Mr. Park. That agreement (the "Member Agreement, **Ex. 1**
hereto) was dated as of December 1, 2006.

10.     Pursuant to the Member Agreement, Mr. Rahman tendered $125,000 to
Mr. Park to enable Mr. Park to purchase an additional member interest in WASLLC. In
consideration for that payment, WASLLC and Mr. Park, both personally and as
WASLLC's majority member and General Sales Manager, expressly represented and
agreed to undertake certain contractual and fiduciary obligations to Mr. Rahman, with the
Member Agreement providing in pertinent part:

> A.      Section 1 – "PARK hereby transfers, assigns, and conveys all of
> his right, title and interest in and to one-third (1/3) of his fifty (50%)
> percent ownership interest in the Company [WASLLC] to each of KHAN
> and RAHMAN so that the actual membership interest in the Company is
> as follows:
>
> | PARK | 16.67% |
> | KHAN | 16.66% |

3

RAHMAN                    16.66%"

B.      Section 2 – "It is acknowledged by all of the parties that PARK shall remain the equal ownership of the Company for the purposes of the Subaru Dealer Sales and Service Agreement, but KHAN and RAHMAN each shall remain the true, legal and actual owner of a 16 2/3 percentage membership interest in the Company."

C.      Section 3 – "PARK acknowledges that the KHAN and RAHMAN have the right and authority to act with respect to their Company membership interest and *any written instructions of KHAN and RAHMAN shall be promptly carried out by PARK. Any funds that PARK may receive from the Company on account of KHAN and RAHMAN shall be promptly turned over to KHAN and RAHMAN or shall be distributed as directed by them.*" (Italics added).

D.      Section 4 – "Each of PARK, KHAN and RAHMAN will receive his 16 2/3 pro-rata share of the income and loss of the Company, and accordingly, the Company will issue K-1 Statements to each of them for such income or loss."

E.      Section 5 – "PARK shall have no discretionary authority to exercise any control over KHAN or Raman's [sic] interest in the Company or to execute any written instruments in any way relating to their interest in the Company, except as authorized by KHAN and RAHMAN. PARK shall immediately forward to KHAN and RAHMAN all correspondence or other written materials relating to the Company that he receives."

F.      Section 6 – "It is agreed among PARK, KHAN and RAHMAN that a member's certificate representing the pro-rata share of their membership interest shall be transferred to KHAN and RAHMAN at any time upon their request."

G.      Section 8 – "KHAN and Raman's [sic] right, title and interest in and to the Company and his rights detailed hereunder shall not be sold, assigned, conveyed, mortgaged, leased, rented, hypothecated or otherwise transferred nor its obligations be assumed, relinquished, satisfied or delegated by PARK without the prior acknowledged written consent of KHAN and RAHMAN in each instance."

H.      Section 10 – "Notwithstanding anything contained in the Operating Agreement or this Agreement to the contrary, all decisions to bind the Company shall require a majority of the Members (the term Members include Khan and Rahman), except the sale of substantially all of the assets of the Company not in the ordinary course, which shall require a

4

two-thirds (2/3) percent or more majority of the Members (the term Members includes Khan and Rahman)."

I.      Section 11 – "KHAN and RAHMAN shall each receive a guaranteed payment from the Company in the amount of One Hundred Twenty Thousand ($120,000) Dollars to be paid to them annually in monthly installments."

J.      Section 12 – "KHAN and *RAHMAN shall also be entitled to their 1/3 share of whatever profit distribution PARK is entitled to under the Operating Agreement.* Thus, they shall receive 1/3 of the first $120,000 of profit distributed and 30% (1/3 of 90%) of the balance of the profit distributed in any year over $120,000." (Italics added).

K.      Section 13 – "As soon as practical PARK and UCC [Universal Capital Corp.] will make application to Subaru to approve the equity holdings of the Company as provided in this Agreement. The parties agree to use due diligence and exercise good faith and their best, immediate, and bona fide efforts to obtain said approvals, and execute any and all documentation reasonably necessary to effectuate the foregoing."

## Mr. Rahman's Involvement In Improving WASLLC's Business

11.     Although not obligated to work for or render any services to WASLLC or

Mr. Park, Mr. Rahman played an active and important role in improving WASLLC's

business after acquiring his member interest in WASLLC because an improvement in

WASLLC's profitability would naturally increase the value of his WASLLC equity

interest. Mr. Rahman revamped WASLLC's financing department, hired new

employees, and revamped WASLLC's advertising. Due in significant measure to Mr.

Rahman's efforts, WASLLC's sales and profitability improved greatly. Instead of losing

tens of thousands of dollars per month for many months of the year, WASLLC began

consistently making profits, averaging roughly $150,000 per month.

**Mr. Park Breaches His Fiduciary and Contractual
Obligations Under The Member Agreement**

12.     Mr. Rahman initially received the guaranteed $10,000 monthly payments
required under Section 11 of the Member Agreement for a number of months, from
December 2006 up until around June 2007. In addition, Mr. Rahman received $30,000 in
profits from Mr. Park for December 2006, pursuant to Section 12 of the Member
Agreement. Those payments plainly evidenced Mr. Park's acknowledgment of his
obligations to Mr. Rahman. However, as WASLLC became more and more profitable,
Mr. Park blocked the distribution of WASLLC's profits to Mr. Rahman and wrongfully
misappropriated those monies for himself.

13.     To justify his misappropriation of WASLLC profits due to Mr. Rahman,
Mr. Park implemented a scheme to pressure Mr. Rahman to relinquish his member
interest in WASLLC for far less than its fair value. As part of that scheme, Mr. Park
offered to buyout Mr. Rahman's member interest in WASLLC for a *one time payment* of
One Hundred Twenty Five Thousand Dollars ($125,000) – representing the return of my
investment without interest -- and the payment of an additional One Hundred Thousand
Dollars ($100,000) in profits over time, representing what even Mr. Park acknowledged
was Mr. Rahman's share of WASLLC's distributions for the seven month period from
January 1 through July 31, 2007.

14.     Mr. Rahman rejected that offer as unreasonably low, as it represented
nothing more than the return of his initial $125,000 investment and a one time profit
distribution that plainly is less than Mr. Rahman was entitled to under the Member
Agreement for one year, let alone the recurring and ongoing annual payments equal to
1/3 of whatever profits Mr. Park received pursuant to Section 12 of the Member

6

Agreement, **and** (b) guaranteed monthly payments of $10,000, pursuant to Section 11 of the Member Agreement due to Mr. Rahman.

15.     When Mr. Rahman to be bought out for such an absurdly low amount, *Mr.*

*Park threatened that he would make arrangements to make sure that Mr. Rahman would*

*not receive anything and would take steps to make sure that WASLLC recorded minimal*

*or no profits from its business.* To that end, Mr. Park, in breach of his contractual and

fiduciary duties to Mr. Rahman, wrongfully tried to force Mr. Rahman to capitulate to his

demands by, *inter alia*:

A.     Stopping the monthly guaranteed $10,000 payments payable to Mr. Rahman as required by Section 11 of the Member Agreement;

B.     Failing/refusing to pay Mr. Rahman 1/3 of whatever profit distribution Mr. Park is entitled to under the Company's Operating Agreement, including, *inter alia*, 1/3 of the first guaranteed $120,000 that Mr. Park receives annually from WASLLC and 1/3 of any further profit distributions Mr. Park receives from the Company in any given year as expressly required by Section 12 of the Member Agreement;

C.     Failing/refusing to pay Mr. Rahman his 16 2/3 pro-rata share of WASLLC's income and failing to provide Mr. Rahman with a K-1 statement for such income as required by Section 4 of the Member Agreement;

D.     Failing/refusing to promptly turn over funds to Mr. Rahman that Mr. Park received and continued to receive on Mr. Rahman's account and failing/refusing to promptly carry out any written instructions from Mr. Rahman concerning the disposition of funds owed to Mr. Rahman as required by Section 3 of the Member Agreement;

E.     Failing/refusing to transfer a member's certificate representing Mr. Rahman's member interest in WASLLC upon Mr. Rahman's request as required by Section 6 of the Member Agreement;

F.     Failing/refusing to notify Subaru of Mr. Rahman's equity interest in WASLLC and failing to use due diligence, good faith and best efforts to obtain Subaru's approval of same, including executing any and all documents reasonably necessary to effectuate same as required by Section 13 of the Member Agreement; and

7

G.    Failing/refusing to forward to Mr. Rahman any and all correspondence or other written materials relating to the Company that Mr. Park received as required under Section 5 of the Member Agreement.

16.    Mr. Park refused to rectify his wrongdoing despite written demands from Mr. Rahman and Mr. Rahman consequently received no payments from Mr. Park or WASLLC since June 2007. Since that time alone, Plaintiff Rahman is entitled to an amount exceeding: (a) $260,000 based on the $10,000 guaranteed monthly payments under Section 11 of the Member Agreement; (b) an additional 1/3 of the first guaranteed $120,000 that Mr. Park receives annually from WASLLC (now over $80,000) **plus** 1/3 of any further profit distributions Mr. Park receives from the Company in any given year as expressly required by Section 12 of the Member Agreement; (c) his 16 2/3 pro-rata share of WASLLC's income under Section 4 of the Member Agreement; and a return of his initial $125,000 investment.

### This Action's Commencement And This Court's Issuance Of A TRO

17.    Mr. Rahman and WASLLC thereafter commenced an action before the Supreme Court, Queens County, on October 1, 2007 via order to show cause (the "State Court Action"). In commencing the State Court Action, Plaintiffs sought and obtained a temporary restraining order from the State Court (**Ex. 2 hereto**):

> enjoining the transfer or sale of any equity interest in Plaintiff WASLLC, and further enjoining each of Defendants from directly or indirectly receiving or transferring to themselves any sales, moneys or assets from WASLLC without consent of PLTF RAHMAN.

18.    A copy of the order to show cause, temporary restraining order, summons and verified complaint and related documents were personally served on Defendants in this action, with proof of service being filed with the State Court. Mr. Park thereafter

8

appeared in this action by filing a cross-motion to dismiss the State Court Action and to
vacate the temporary restraining order, in lieu of filing an answer.

19.     During November 2007, the State Court ordered Mr. Park to make
WASLLC's books and records available for inspection by Mr. Rahman and his
accountant. During that inspection, significant and troubling accounting irregularities
were discovered (**Ex. 3** hereto) that indicated that Mr. Park had been tampering with the
books to understate WASLLC's profits and revenues and to coverup his misappropriation
of WASLLC funds.

20.     By order dated January 30, 2008 (the "Stay Order"), the State Court stayed
this action, erroneously holding that it was subject to mandatory arbitration. However,
the State Court denied Defendants' motion to vacate the temporary restraining order,
specifically holding that:

> the restraining order shall remain in full force and effect during the
> pendency of this action and any arbitration proceedings until further order
> of the court or upon consent of the parties.

21.     On June 26, 2008, Defendants moved again to vacate the temporary
restraining order, which motion the Court denied by order dated November 3, 2008.

### Defendants' Default And Knowing Violation Of The State Court's TRO

22.     By decision and order dated June 9, 2009 (the "Appellate Decision"), the
Appellate Division, Second Department, modified the State Court's Stay Order, holding
that the dispute was not subject to mandatory arbitration. A copy of the Appellate
Decision with notice of entry was served on Defendants' counsel and filed with this
Court on or about July 28, 2009. In accordance with the Appellate Decision, the stay of
the State Court Action was lifted.

23.    The Appellate Decision was entered on or about June 15, 2009.

Defendants' answer therefore was due on or about July 15, 2009.

24.    On August 6, 2009, Mr. Rahman's counsel wrote to Mr. Park's counsel

advising that a preliminary conference had been scheduled in the State Court Action for

August 26, 2009 and further noting that Defendants were in default in answering their

complaint and that "unless we receive Defendants' answer within the next seven days,

that default will be deemed willful . . . ."

25.    After receiving no response from Defendants' counsel, on August 12,

2009, Plaintiffs' counsel called and spoke with Defendants' counsel in the State Court

Action and advised him that Defendants were in default. **In response, Mr. Park's

counsel advised, in sum and substance, that his firm had not heard from Defendant

Park in quite some time, strongly doubted that his firm would be hearing from

Defendant Park again, and stated that Defendants' counsel would not be preparing

an answer to the verified complaint in this action,** underscoring the willfulness of Mr.

Park's default.

26.    Plaintiffs subsequently learned that Defendant Park, without notice to

Plaintiff Rahman or to the State Court, had closed down WASLLC's operations, closed

down its bank accounts, and transferred WASLLC's assets to himself and his wife, Mrs.

Park,, and used WASLLC assets in setting up another auto dealership, Max World of

Cars, in plain violation of the State Court's temporary restraining order.

27.    Given Mr. Park's failure to answer the State Court Complaint and Mr.

Park's evident willful violation of the State Court's temporary restraining order, Plaintiffs

10

moved against Mr. Park and Auto Solution for a default judgment and to have them held in contempt on or about October 7, 2009.

28.    Neither Mr. Park nor Auto Solution filed any opposition papers to that motion. Well after their time to file those opposition papers had expired, Mr. Park filed his voluntary Chapter 7 bankruptcy petition with this Court on or about November 11, 2009, thereby automatically staying the State Court Action.

29.    Mr. Park's bankruptcy petition knowingly and fraudulently omitted to disclose his financial and member interest in Defendant Auto Solution, aka Jaeil Capital Corp. Mr. Park's interest in Auto Solution is undeniable, being admitted by him under oath in an affidavit Mr. Park submitted in the State Court Action, which was sworn to October 23, 2007 (the "Park Aff.," **Ex. 4 hereto**). At Paragraph 12 of the Park Aff., Mr. Park acknowledged that "I and three friends (unrelated to World Auto Sales), formed Jaeil Capital Corp. ("Jaeil") d/b/a Auto Solution . . . " and further admitted that he was to "share in 25% of its profits."

30.    A creditor's meeting was held on or about December 4, 2009 in connection with Mr. Park's bankruptcy petition. During the creditor's meeting, Mr. Park acknowledged receiving substantial monies (at least $20,000 to $30,000) from Universal Subaru, a fellow member in WASLLC within the past year – which violated the terms of the State Court's TRO.

31.    During that creditor's meeting, Mr. Park further acknowledged under oath that he had formerly had personal bank accounts with Citibank and JP Morgan Chase, but that those accounts had been changed to be put solely in the name of his wife, Defendant

11

Mrs. Eun Ha Park, in or around April 2009, underscoring his fraudulent

transfer/conveyance of assets.

32.     During the creditor's meeting, Mr. Park failed to disclose his financial and

member interest in Auto Solution d/b/a Jaeil Corp. When Mr. Park was questioned about

that interest and shown a copy of the Park Aff., Mr. Park lied under oath and said that

Auto Solution/Jaeil was a part of WASLLC, contrary to his sworn testimony in the Park

Aff. that Auto Solution d/b/a Jaeil had substantially three other members who were

"unrelated to World Auto Sales" which members collectively owned at least a 75%

interest in Auto Solution/Jaeil.

## FIRST CLAIM FOR RELIEF (WILLFUL BREACH OF FIDUCIARY DUTY WITH DEFALCATION

33.     Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs

1-32 above as if fully set forth herein.

34.     As a majority member and General Sales Manager of WASLLC, Mr. Park

owed a fiduciary duty to Mr. Rahman, as a minority member of WASLLC, and

WASLLC itself.

35.     Mr. Park willfully breached his fiduciary duties to, and committed

defalcations against, Mr. Rahman by secretly misappropriating WASLLC monies,

tampering with WASLLC's books, willfully violating the State Court TRO, and denying

Mr. Rahman the rights and benefits of his member interest in WASLLC.

36.     As a result of those willful breaches of fiduciary duty and defalcations by

Mr. Park, Mr. Rahman has been financially injured, with Mr. Rahman's damages

amounting to an amount to be determined at trial, but not less than $2,000,000.

12

37.    Mr. Park's willful breaches of his fiduciary duties and defalcations constitute grounds to dismiss Mr. Park's bankruptcy petition and to deny discharge of his obligations to Mr. Rahman pursuant to Section 523(b)(4) and other pertinent provisions of the Bankruptcy Code.

## SECOND CLAIM FOR RELIEF (FALSE PRETENSES)

38.    Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-37 above as if fully set forth herein.

39.    Mr. Park received $125,000 in funds from Mr. Rahman under false pretenses, representing to Mr. Rahman that in exchange for such funds, Mr. Rahman would receive a 16.66 percent member interest in WASLLC, that Mr. Park would honor that interest, and that Mr. Rahman would receive other benefits as specifically represented in the Member Agreement described in Paragraph 10 above.

40.    Those representations made by Mr. Park were knowingly false and/or misleading when made as part and parcel of a scheme by Mr. Park to obtain monies from Mr. Rahman under false pretenses.

41.    Mr. Rahman reasonably relied upon those false and misleading representations by Mr. Park to his detriment.

42.    As a result of the foregoing false pretenses by Mr. Park, Mr. Rahman has been financially injured, with Mr. Rahman's damages amounting to an amount to be determined at trial, but not less than $2,000,000.

43.    Mr. Park's obtaining monies from Mr. Rahman under false pretenses constitute grounds to dismiss Mr. Park's bankruptcy petition and to deny discharge of his

13

obligations to Mr. Rahman and WASLLC pursuant to Section 523(b)(2) and other
pertinent provisions of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF (FRAUDULENT TRANSFER/CONVEYANCE)

44.     Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs
1-43 above as if fully set forth herein.

45.     Within approximately six months of his bankruptcy filing, Mr. Park
fraudulently transferred assets to Mrs. Park by, *inter alia*, having bank accounts in his
name changed to bank accounts solely in her name and by transferring assets to Max's
World of Autos, in which Mrs. Park holds a majority ownership interest. Such transfers
lacked fair consideration and were undertaken with an awareness of pending state court
litigation against Mr. Park and to conceal assets in connection with Mr. Park's
bankruptcy filing.

46.     The assets fraudulently transferred by Mr. Park included in material part
assets properly belonging to Mr. Rahman and/or WASLLC.

47.     As a result of the foregoing, Mr. Rahman has been financially injured,
with Mr. Rahman's damages amounting to an amount to be determined at trial, but not
less than $2,000,000.

48.     The foregoing fraudulent transfers constitute grounds to dismiss Mr.
Park's bankruptcy petition and to deny discharge of Mr. Park's obligations to Mr.
Rahman and WASLLC under the applicable provisions of the Bankruptcy Code.

### FOURTH CLAIM FOR RELIEF (DECLARATORY JUDGMENT)

49.     Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs
1-48 above as if fully set forth herein.

14

50.    Plaintiffs are entitled to a declaratory judgment that their claims against

Mr. Park, asserted in this action and the State Court Action, are not dischargeable in

bankruptcy.

WHEREFORE, Plaintiffs request judgment as follows:

A.    On the First Claim for Relief, dismissing Mr. Park's bankruptcy petition,

denying discharge of Mr. Rahman's claims, and awarding judgment to

Mr. Rahman against Mr. Park in an amount to be determined at trial, but

not less than $2,000,000;

B.    On the Second Claim for Relief, dismissing Mr. Park's bankruptcy

petition, denying discharge of Mr. Rahman's claims, and awarding

judgment to Plaintiff Mr. Rahman against Mr. Park in an amount to be

determined at trial, but not less than $2,000,000;

C.    On the Third Claim for Relief, dismissing Mr. Park's bankruptcy petition,

denying discharge of Mr. Rahman's claims, and awarding judgment to

Plaintiff Mr. Rahman against Mr. Park and Mrs. Park in an amount to be

determined at trial, but not less than $2,000,000;

D.    On the Fourth Claim for Relief, issuing a declaratory judgment that Mr.

Rahman's claims asserted in this action and the State Court Action are not

dischargeable in bankruptcy;

E.    Awarding Plaintiffs interest, costs, reasonable attorneys' fees and such

other and further relief as the Court deems just and appropriate.

Dated: February 2, 2010

LAW OFFICES OF DEAN T. CHO, ESQ.

By: _____

          Dean T. Cho    (DC 7986)

10217 72nd Avenue
Forest Hills, NY 11375
(718) 344-8188
Counsel for Plaintiffs

# EXHIBIT 1

## 103

### Exhibit B-Member Agreement dated December 1, 2006 [103-110]

### AGREEMENT

AGREEMENT made as of the 1st day of December, 2006, by and between ADIL M. KHAN, residing at 1529 Oneida Avenue, Bellmore, New York ("KHAN"), and SAYEUR RAHMAN, residing at 4822 Robertson Street, Bronx, New York ("RAHMAN") and SEUNG M. PARK a/k/a JOSEPH PARK, residing at 11 Virginia Avenue, Plainview, New York ("PARK")

### WITNESSETH:

WHEREAS, PARK has been the owner of record of a 15% membership interest in Arid Auto Sales, LLC (the "Company");

WHEREAS, PARK simultaneously herewith is acquiring an additional 35% membership interest in the Company for $250,000, to bring him to a total record ownership of 50%;

WHEREAS, the $250,000 was provided by KHAN and RAHMAN and thus simultaneously herewith, PARK is transferring thirty-three and one-third (33 1/3%) percent of its membership interest in the Company which equals 16 2/3% of the overall membership in the Company equally to KHAN and RAHMAN;

WHEREAS, PARK have entered into that certain Operating Agreement for the Company which is being amended and restated simultaneously herewith (the "Operating Agreement"); and

WHEREAS, the Subaru Dealer Sales and Services Agreement reflects that the membership units of the Company are owned and held by PARK; and

WHEREAS, the parties herein desire to modify the ownership of the Company to reflect

C:\Documents and Settings\Your Identity\Documents\Work\membershipagreement.doc    2

Feb 02 10 10:59p        Dean T. Cho, Esq.                                        718-263-4009              p.23

104

Feb 02 10 10:59p    Dean T. Cho, Esq.    718-263-4009    p.24

sold to them for said income or loss

5.    PARK shall have no discretionary authority to exercise any control over KHAN or PARK's interest in the Company or to cancel any vested amounts in any way subject to this interest in the Company, except as authorized by KHAN and RAHMAN. PARK shall immediately forward to KHAN and RAHMAN all correspondence or other written materials relating to the Company that he receives.

b.    It is agreed among PARK, KHAN and RAHMAN that a member's certificate representing the pro-rata share of their membership interest shall be transferred to KHAN and RAHMAN at any time upon their request.

7.    KHAN and RAHMAN hereby agree to defend and indemnify PARK and save in harmless from and against any liability whatsoever PARK may incur by reason of the KHAN and RAHMAN Company interest being attributed to PARK in any matter.

8.    KHAN and Rahmar's right, title and interest in and to the Company and his rights hereunder shall not be sold, assigned, conveyed, mortgaged, leased, rented, or ceded or otherwise transferred nor its obligations be assumed, reclinquished, satisfied or caused by PARK without the prior acknowledged written consent of KHAN and RAHMAN

9.    Notwithstanding that KHAN and RAHMAN are not a parties signatory to the said Agreements, said companies and agrees to be bound by the terms, conditions and restrictions of said Agreements as if they were party signatories thereto.

106

10.    Notwithstanding anything contained in the Operating Agreement or this Agreement to the contrary, all decisions to bind the Company shall require a majority of the Members (the term Members include KHAN and RAHMAN), except the sale of substantially all of the assets of the Company not in the ordinary course, which shall require a two-thirds (2/3%) percent or more majority of the Members (the term Members includes KHAN and RAHMAN).

11.    KHAN and RAHMAN shall each receive a guaranteed payment from the Company in the amount of ONE HUNDRED TWENTY THOUSAND ($120,000) DOLLARS to be paid to them annually in monthly installments.

12.    KHAN and RAHMAN shall also be entitled to their 1/3 share of whatever profit distribution PARK is entitled to under the Operating Agreement. Thus, they shall each receive 1/3 of the first $120,000 of profit distributed and 30% (1/3 of 90%) of the balance of profit distributed in any year over $120,000.

13.    As soon as practical PARK and UCC will make application to Subaru to approve the equity holdings of the Company as provided in this Agreement. The parties agree to use due diligence and exercise good faith and their best, immediate, and bona fide efforts to obtain said approvals, and execute any and all documentation reasonably necessary to effectuate the foregoing.

14.    This Agreement may not be amended or supplemented at any time unless such Agreement is in writing signed by the parties hereto and so titled an amendment or supplement hereto. Each of the parties hereto covenants and agrees that he will do any act or thing, and will execute any and all instruments necessary and/or proper to effectuate the provisions of this Agreement. This Agreement shall be governed, construed and enforced in accordance with the

**107**

laws of the State of New York.

15.    The parties hereto agree that the terms and conditions of this Agreement are of utmost concern to each and to the continuance of the Company's business, and require total confidentiality and, accordingly, each party hereto covenants and agrees to and with each other, and for his respective counsel, heirs, executors, administrators, and as to the Company, any successors, to maintain such confidence and, particularly, not to release copies or otherwise disclose the contents hereof, or any part of same, to any person, or entity, without the express, prior written approval of each party so to do, which approval may, at his sole discretion, be unreasonably withheld. It is not intended hereby to preclude enforcement of this Agreement as against any one or more parties hereto in any court of competent jurisdiction where a dispute arising hereunder is to be adjudicated, however, each and every party hereto expressly waives his and its right to a trial by jury and agrees to request (and consent to) "in camera" disclosure of this Agreement by the adjudicating court and any and all appellate panels reviewing such decision(s).

16.(a)    This Agreement shall be binding upon the parties hereto, their respective heirs, administrators, executors, and assigns, and the parties hereto do covenant and agree that each of their respective heirs, executors, administrators, and assigns will execute any and all such other and further documents that may be required of them to effectuate the interest and purpose of this Agreement.

(b)    In the event of any conflict in terms between this Agreement and the Operating Agreement of Company, this Agreement shall control.

(c)    The invalidity or unenforceability of any particular provision of this Agreement

c:\Documents and Settings\Your Name\My Documents\Nor-Oakland\agreement_.doc            5

shall not affect the other provisions hereof, and this Agreement shall be construed in all respects

as if such invalid or unenforceable provisions were omitted.

IN WITNESS WHEREOF, the parties hereto have duly executed this agreement as of

the date first above written.

SEUNG M. PARK a/k/a JOSEPH PARK

ADIL M. KHAN

SAYFUR RAHMAN

Louisa Ajamian
Notary Public, State of New York
No. 01AJ5081985
Qualified in Queens County
Commission Expires June 17

STATE OF NEW YORK:

COUNTY OF

On _____, 2006, before me, the undersigned, a Notary Public in and for
said State, personally appeared SEUNG M. PARK a/k/a JOSEPH PARK, personally known to
me or proved to me on the basis of satisfactory evidence to be the individual whose name is
subscribed to the within instrument and acknowledged to me that he executed the same in his
capacity and that by his signature on the instrument, the individual, or the person upon behalf of
which the individual acted, executed the instrument.

NOTARY PUBLIC

Louisa Ajamian
Notary Public, State of New York
No. 01AJ5081985
Qualified in Queens County
Commission Expires June 17

6

109

STATE OF NEW YORK:

COUNTY OF

On                          , 2006, before me, the undersigned, a Notary Public in and for said State, personally appeared SAYFUR RAHMAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

Louise Ajemien
Notary Public, State of New York
No. 01AJ5061986
Qualified in Queens County
Commission Expires June 17  2010

Louise  Ojemien

**110**

STATE OF NEW YORK:

COUNTY OF

On                , 2006, before me, the undersigned, a Notary Public in and for said State, personally appeared ADIL M. KHAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC

Louise Ajomian
Notary Public, State of New York
No. 01AJ6061988
Qualified in Queens County
Commission Expires June 17    2010
Louise Ajomian

**EXHIBIT 2**

## 18

### Order to Show Cause dated October 1, 2007 [18-19]

A IAS Part: ___ , of the
Supreme Court of the State of New York,
Held in and for the County of Queens, _____
On the ___ Day of October, 2007

**NO MOTION FEE
FILED ON
COMMENCEMENT**

--------------------------------------------------------------X

SAYFUR RAHMAN
and WORLD AUTO SALES. LLC,                    :    Index No. ___ 9 9 7 - 0 7

                                              :    R.J.I. No. _____

                Plaintiffs,                   :

                                              :    ORDER TO SHOW CAUSE
        -against-                             :    AND TEMPORARY
                                              :    RESTRAINING ORDER
SEUNG M. PARK, a/k/a JOSEPH PARK, and
AUTO SOLUTION,                                :    PRESENT:
                                              :    HON. ROGER N. ROSENGARTEN
                Defendants.                   :

--------------------------------------------------------------X

UPON THE FILING OF the annexed affirmation of Dean T. Cho, dated October

1, 2007, the annexed affidavit of Plaintiff Sayfur Rahman, sworn to October 1, 2007, the

summons, complaints and exhibits attached thereto, and a just cause appearing therefore,

IT IS HEREBY ORDERED, that Defendants Seung M. Park, a/k/a Joseph Park,

and Auto Solutions show cause at IAS Part ___ of this Court to be held in and for the

County of Queens at Supreme Courthouse, 88-11 Sutphin Boulevard, Jamaica, New York

11435 on the 27th day of October, 2007 at ___ 9:30 ___ AM/PM, or as soon

thereafter as counsel may be heard, why an order should not issue:

        A.      Appointing a temporary receiver to oversee/manage WASLLC's

        business and finances during the pendency of this litigation;

        B.      Granting a temporary restraining order and preliminary injunction

        enjoining the transfer or sale of any equity interest in WASLLC without

        Plaintiff Mr. Rahman's consent;

1

**19**

C.     Granting a temporary restraining order and preliminary injunction

enjoining Defendants' receipt or transfer, directly or indirectly, of any

sales or funds from WASLLC; and

D.     Directing Defendants to make all books, records and accounts of

the businesses and finances of Plaintiff WASLLC, Defendant Seung M.

Park a/k/a Joseph Park, and Defendant Auto Solution immediately

available for an accounting at the respective expense of WASLLC. Mr.

Park and Auto Solution.

IT IS FURTHER ORDERED that pending the ~~preliminary injunction~~ hearing, a *of the motion*

temporary restraining order is hereby issued enjoining the transfer or sale of any equity

interest in Plaintiff WASLLC, and further enjoining each of Defendants from directly or

indirectly receiving or transferring to themselves any sales, moneys or assets from

WASLLC, ~~without Court approval, and~~ *consent of Pltf Rachman*

IT IS FURTHER ORDERED that a copy of this order and accompanying

*together with the summons and verified complaint*

supporting papers of Plaintiffs shall be served on Defendant Seung M. Park, a/k/a Joseph

Park on behalf of himself and Defendant Auto Solution, by personal service or facsimile

by October *17*, 2007.

~~IT IS FURTHER ORDERED that Defendants' opposition papers, if any, are to be~~

~~served on counsel for Plaintiff by hand or by facsimile at least two days before the~~

~~scheduled preliminary injunction hearing.~~

ENTER,

/S/

J.S.C.

2

# EXHIBIT 3

## 285

**Exhibit I-Letter dated November 20, 2007 from Kenneth Abrahams, CPA to Dean T. Cho [285-286]**

11/20/2007  18:00     5163266883          ROSENBLATT KIMAN                    PAGE  01/02

# ROSENBLATT, KIMAN, LEVITTAN, LEVINE & CO. LLP

<u>CERTIFIED PUBLIC ACCOUNTANTS/</u>          Members: New York State Society of CPAs, American Institute of CPAs

1700 JERICHO TURNPIKE                                   Steven J. Rosenblatt
NEW HYDE PARK, NY 11040                                 Gary D. Kiman
                                                        Barry C. Levittan
                                                        Harvey Levine
TELEPHONE:  516-326-8282                                Christopher L. Volpis
FAX:        516-326-8083                                Kenneth Abrahams
                                                        Marc A. Goetz
                                                        Marvin Heltner

Dean T. Cho
Tuan & Cho, LLP
225 Broadway, Suite 2900
New York, NY 10007

November 20, 2007

Re: Rahman v. Park

Our Review of World Auto Sales LLC was for the period December 2006 to July 2007

During our review the following items that were discovered are:

1) Sayfur Rahman is not an listed as an equity partner of World Auto Sales LLC on the December 31, 2006 tax return
2) The December 2006 Inventory Schedules do not match the December 2006 General Ledger Accounts, these items are normally the same. The discrepancy appears to be in the $100,000s.
3) January 2007 Inventory Schedules do not match the January 2007 General Ledger Accounts (same as item 2 above)
4) Dec '06 Run Date of books is March 5, 2007 (this is an unusual delay of printing the books normally the manufacturer requires the a complete accurate financial statement by the 15th of the following month)
5) Dec '06 Used Vehicle Inventory Schedule is March 6, 2007 (see note 4)
6) Run Date of Jan '07 Books March 24, 2007 (see note 4)
7) Run date of Used Vehicle Inventory Schedule for January is March 22, 2007 (see note 4)
8) February 2007 - Missing the first 11 pages of Schedule 10 – Customer Receivables (not normal procedure)
9) No General Ledger for the Month of February 2007 available (this raises a question as to the accuracy of the books and records provided)
10) February 2007 New and Used Sales Receipt book approx $160,000 cash from Customers (without the general ledger this raises serious questions as to how the funds were accounted for and where the cash was reported)

## 286

11) February 2007 Service and Parts Sales Receipt book approx $9,679 cash receipts from Customers (see note 10)

12) A review of various cash disbursements was conducted and although the checks and charges where clearly noted no explanation has been given for certain items. I have requested additional support but we ran out of time.

13) Discrepancies, between the general ledger balances and printed schedules balances, were found in numerous months reviewed (This would seem to indicate that the records are inaccurate and cannot be relied upon)

14) Cash collected on delivery, in some instances, was not being deposited into the bank or allocated correctly, instead the monies collected was increasing the value of other vehicles. This is strong evidence of misappropriation of funds and that the profit was artificially decreased.

We requested but did not complete a review of all the General Journal entries for the period under review.
We need to review the Deal jackets (the documents supporting the sales)
In order to get a more accurate picture of the operations further review is needed
Please excuse the format of this document but I believe it covers what we did.

Very Truly Yours,

Kenneth Abrahams, CPA

# EXHIBIT 4

# 278

**Exhibit E-Affidavit of Joseph Park in Opposition to Plaintiff's Motion and in
Support of Cross-Motion, sworn to October 23, 2007 [278-284]**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------------X
SAYFUR RAHMAN and WORLD AUTO SALES, LLC.,

                          Plaintiffs,                          AFFIDAVIT

                                                      Index # 2448/2007
           -against-                                  J. ROGER ROSENGARTEN

SEUNG PARK a/k/a JOSEPH PARK, and
AUTO SOLUTION,

                          Defendants.
-----------------------------------------------------------------------X

STATE OF NEW YORK      )
                       )ss:
COUNTY OF NASSAU       )

        JOSEPH PARK, being duly sworn, deposes and says:

        1. I am defendant SEUNG PARK, a/k/a JOSEPH PARK, and I submit this

affidavit in opposition to plaintiff's motion and in support of my cross-motion.

        2. I absolutely deny all the allegations in plaintiffs' motion papers that I "looted"

and "misappropriated" monies and assets of World Auto Sales, LLC ("the company").

        3. I have extensive experience in automotive sales. The property where Auto

World Sales is situated was unoccupied in January, 2004, and I spoke with Michael

Oshry ("Oshry"), who had an ownership interest therein, to rent the property and start a

used car dealership. He was also an owner of a nearby Subaru dealership, and we

ultimately agreed to be equal partners in a used car dealership at the unoccupied

1

**279**

premises, for which we contributed equal sums of money, and organized World Auto

Sales, LLC (in January 2004) under the New York State Limited Liability Company Act.

I was the company's full-time general manager, and Oshry (Universal Capital Corp.)

handled its executive functions. My compensation was $10,000.00 monthly, and his was

$7,500.00 monthly.

4. Through my efforts World Auto Sales became profitable. In mid-2005 World

Auto Sales acquired the Subaru franchise through Universal Capital Corp. and began

doing business as "Universal Subaru", selling used vehicles and new Subaru vehicles.

Universal Capital Corp's membership interest in World Auto Sales increased to 85% and

mine was reduced to 15%. Our duties and compensation allocations remained the same.

5. In November, 2006 the company hired Adil Kahn ("KAHN") as its full-time

sales manager. Kahn asked for an opportunity to also invest in the company. Plaintiff

Rahman was Kahn's former co-worker as a finance manager at another dealership.

Together, Kahn and Rahman solicited the opportunity to invest in, and work for, World

Auto Sales. Kahn agreed to remain as its full-time sales manager, and Rahman promised

to start as the company's full-time finance manager upon the company's acceptance of

his request for the opportunity to invest. Both Kahn and Rahman agreed that their

respective investment interests in the company would continue only as long as they

remained as its full-time sales manager and finance manager respectively. I was already

2

**280**

the full-time general manager, Kahn was already the full-time sales manager, and

Rahman committed to start as the full-time finance manager of World Auto Sales. Kahn

and Rahman both expressly agreed that their individual $125,000 investment interests in

the company were contingent upon their satisfactorily remaining as the full-time sales

manager and finance manager respectively of World Auto Sales.

    6. The resulting investment agreement (annexed to plaintiff's motion papers), was

not signed by either <u>World Auto Sales nor Universal Capital Corp</u>. Kahn and Rahman

each received a 16 2/3rds percent interest in the company, plus compensation and profit

allocation amounts <u>identical to mine</u> ($120,000 annual salary; plus $40,000 of the first

$120,000, and one-third of the balance, of the company's distributed net profits). My

interest in the company was also 16 2/3rds percent, and Universal Capital Corp. retained

a 50% interest. The fact that Kahn, Rahman and me each received the <u>same interest</u> in the

company and the <u>identical compensation and profit-sharing amounts</u> was based upon, and

confirms, that we were each to contribute the company as its full-time workers as general

manager (me), sales manager (Kahn) and finance manager (Rahman).

    7. Paragraph 9 of that investment agreement states:

    "<u>Notwithstanding that KAHN and RAHMAN are not parties signatory to</u>
<u>the Operating Agreement, each covenants and agrees to be bound by the terms,</u>
<u>conditions and covenants of said Agreements as if they were party signatory</u>
<u>thereto.</u>"

3

**281**

Any claims arising from these beneficial interests in World Auto Sales, and any claim

involving the company or Universal Capital Corp., or involving an interpretation (or

arising under) its Operating Agreement, must be submitted to arbitration pursuant to

Paragraph XXIX of the Operating Agreement, which states:

> "Any controversy, claim or dispute arising out of or relating to this
> Agreement, or the breach thereof, or the interpretations of any of its provisions,
> shall be settled by arbitration in New York State in accordance with the
> commercial rules of the American Arbitration Association . . ."

8. Rahman's duties as the company's finance manager were to include his

drafting and closing of all customers' contracts and financing arrangements, which

should have required his full-time attendance at the dealership. His affidavit (paragraph

#18) fraudulently claims that he "never obligated [himself] to work for or render any

services to World Auto Sales." He contends that his $125,000.00 investment entitled him

to receive the 16 2/3rds interest in the company, plus $120,000.00 annually, and

$40,000.00 of its first $120,000.000 net profits (and 30% of its additional net profits)

annually, without any obligation whatsoever to provide any services to the company!

9. Between December, 2006 and July 20, 2007, I continued as the full-time

general manager, and Kahn continued as the full-time sales manager. We both gave the

company our best full-time efforts. However, Rahman appeared at the dealership only at

4

**282**

his own convenience, and took six weeks off completely. We informed him that his
compensation from, and interest in, World Auto Sales, remained dependent upon his
being its full-time sales manager. He continually promised to begin working full-time as
its finance manager, and he received full compensation during the entirety of this period.
He instead began managing a Manhattan restaurant, and he refused to be our company's
full-time finance manager. World Auto Sales received dozens of complaints filed by its
customers with the Attorney General and the Department of Consumer Affairs on
account of Rahman's conduct. We discovered he improperly reduced sales prices for
several of his "favored" customers, and that he failed to account for $56,700 received
from customers! Attached as Exhibit "A" is a customer contract, dated July 17, 2007,
signed by Rahman, reciting a $10,000 deposit to Rahman, but never received by World
Auto Sales! On or about July 20, 2007, on behalf of World Auto Sales, I and Universal
Capital Corp., representing a majority membership interest in the company, decided to
terminate Rahman's "employment" and his consequent interest in World Auto Sales for
cause. I duly notified Rahman of his discharge from employment and termination of his
interest in the company.

10. Plaintiff's motion papers recite Kahn's arrest by federal probationary
authorities in August, 2007, the month after Rahman's termination. During his
employment at World Auto Sales, Kahn was the company's successful full-time sales

5

**283**

manager. He agreed to surrender his investment interest back to World Auto Sales after his arrest, but that is in abeyance due to this court's restraining order.

11. Rahman's monetary claims against World Auto Sales (for his compensation and value of his 16 2/3rds percent terminated interest) obviously require that World Auto Sales and Universal Capital Corp., its majority member, be named in the action and given notice. Rahman's additional demands that a temporary receiver be appointed, and that the company be involuntarily dissolved, further require that the company and its majority member be made parties hereto and be given notice. This lawsuit is also defective in naming the company as a co-plaintiff, as Rahman's interest therein was terminated in July, 2007, and he has never been authorized to commence a lawsuit on its behalf, and as his claims are against the company!

12. Rahman's allegation that "Auto Solution" is a sham through which I stole from World Auto Sales is an absolute lie. My attorney has invited Rahman's lawyer to review all the relevant financial records of World Auto Sales. Approximately six weeks before Rahman's motion, I and three friends (unrelated to World Auto Sales), formed Jaeil Capital Corp. ("Jaiel"), d/b/a Auto Solution, situated at an office approximately -25-minutes (by car) from World Auto Sales. I did not contribute any money (or start-up funds) to this entity, nor have I received anything from it. It assists buyers of cars to negotiate with the sellers. It does not own any vehicles, and it neither sells leases nor

6

**284**

repairs any vehicles. It does not compete with World Auto Sales in any manner. Its

business is common for foreign language buyers who cannot negotiate in English. World

Auto Sales indeed benefited from Jaeil's referral of two customers, who then bought

vehicles. I still am the full-time, six-days weekly, general manager of World Auto Sales.

I devote less than five-hours weekly to Jaeil. I contribute only my knowledge to Jaeil, and

I will only share in 25% of its profits, if and when it ever earns profits. I do not receive

any salary or money, or anything else from Jaeil. To date, it has assisted very few buyers,

and a copy of its bank account statement is annexed as Exhibit "B".

   13. I oppose the request to review my personal financial records, especially until

Rahman completes his review of the records of World Auto Sales.

   WHEREFORE, it is respectfully requested that plaintiffs' motion be denied, the

restraining order be vacated, and the cross-motion to dismiss be granted.

JOSEPH PARK

Duly sworn to before me this
23 day of October, 2007

John G. Gentile
Notary Public, State of New York
Qualified in Nassau County
No. 02GE5072287
Commission Expires Jan. 27, 20 11

7